UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

2007 MAR 30

Venantius O. Eneje,                )
                                   )
            Plaintiff,             )          Civil Action No. 9:04-1695-SB
                                   )
v.                                 )          **O R D E R**
                                   )
Alberto R. Gonzales, Attorney General  )
of the United States,              )
                                   )
            Defendant.             )
_____)

This matter is before the Court upon Plaintiff Venantius O. Eneje's ("Plaintiff") <u>pro se</u> complaint, wherein he alleges employment discrimination based on his race (black) and national origin (Nigerian), and retaliation for filing a complaint alleging discrimination and for whistle blowing, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e17, and the Whistleblower Protection Act, 5 U.S.C. §§ 1214, 1121, and 2302. On March 21, 2005, Defendant Alberto R. Gonzales ("Defendant") filed a motion for summary judgment. The record contains a report and recommendation ("R&R") of a United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B). In the R&R, the Magistrate Judge recommends that the Court grant the Defendant's motion for summary judgment. After being granted an extension of time in which to file objections, the Plaintiff filed objections to the R&R. <u>See</u> 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to a Magistrate Judge's R&R within ten days after being served with a copy). The Defendant filed a response to the Plaintiff's objections, and the Plaintiff replied to the Defendant's response.



## BACKGROUND

The Plaintiff, a black male United States citizen who is originally from Nigeria, was

employed as a civilian physician's assistant ("PA") at the Federal Correctional Institution ("FCI") located in Ashland, Kentucky from January of 1992 until he was terminated on October 5, 1992. At the time, John Ashcroft served as Attorney General and was in charge of the United States Department of Justice ("DOJ"), which operates the Bureau of Prisons.

In October of 1992, the Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor regarding the termination of his employment. Thereafter, the Plaintiff filed a timely complaint of discrimination. After investigating the Plaintiff's claims, the DOJ Complaint Adjudication Office ("COA") issued its final decision on May 18, 1994, finding that the Plaintiff had been discriminated against on the basis of race and national origin, ordering that Plaintiff be reinstated to his position, and awarding back pay.

After reinstatement, the Plaintiff received a check for back pay on May 27, 1995. Because the Plaintiff believed that he was entitled to a greater amount of back pay, he filed another formal EEO complaint on May 28, 1996, alleging retaliatory discrimination and seeking a recalculation of his back pay. After investigation, the CAO dismissed the Plaintiff's complaint for failure to state a claim. The Plaintiff appealed this decision to the Equal Employment Opportunity Commission ("EEOC") on March 24, 1997. The EEOC affirmed the dismissal of the Plaintiff's complaint, as did the district court for the Eastern District of Kentucky and the Sixth Circuit Court of Appeals.[1] In November of 1997, while the Plaintiff's second discrimination complaint was pending, the Plaintiff was transferred from FCI-Ashland to FCI-Estill in Estill, South Carolina.

On May 17, 2000, the Plaintiff applied for a Supervisory PA position at FCI-Estill

---

[1] Eneje v. Ashcroft, 67 Fed.Appx. 901 (6 th Cir. 2003), aff'g, 183 F. Supp. 2d 931 (E.D. Ky. 2001), aff'g, EEOC Appeal No. 01973692, 1998 WL 556932 (August 19, 1998).

under vacancy announcement number 00-ARO-057. On or about June 6, 2000, the Plaintiff received notification that vacancy announcement 00-ARO-57 was closed without selection of someone to fill the position. Subsequently, on September 28, 2000, PA Luis Calvo was appointed as Acting Supervisory PA. Then, in June 2001, the Defendant appointed Raymond Decker as Acting Supervisory PA.

On April 25, 2001, the Plaintiff received an overall "exceeds" annual performance appraisal for the period extending from April 1, 2000, to March 31, 2001.

After the performance appraisal, on May 3, 2001, the Plaintiff lost his set of keys to a cabinet in the prison pharmacy, located inside the prison walls of FCI-Estill. An inmate found the keys and handed them over to Jacquelyn Reed Bush, the Medical Records Supervisor. Bush stated that when she approached the Plaintiff about the keys, she noticed that he was not wearing his security belt key chain, and when she asked him why he was not wearing the security belt key chain, the Plaintiff stated, "I ain't worrying about that . . . [don't] worry about it." According to Bush, the Plaintiff then checked his pockets and realized that he did not have the pharmacy keys. Bush handed the keys to the Plaintiff, who repeatedly thanked Bush. Assistant Locksmith Douglas Schmidt testified that the Plaintiff told him that his security belt key chain was broken, and the Plaintiff asked Schmidt to issue him a new key holder. Special Investigative Supervisor M. E. Murphy investigated the Plaintiff's loss of the pharmacy keys.

On June 19, 2001, the Plaintiff publicly informed Warden Steven Gal during a health services department staff meeting that he had "unqualified people in medical records." The Plaintiff asserts that Associate Warden Arcala Washington Adduci immediately shouted at him to come directly to her office to get his "deficient write-ups." The Plaintiff also

3

asserts that Associate Warden Adduci gave him a "Counseling Statement" regarding his failure to complete required medical documentation.

The Plaintiff also testified that his problems began shortly after he made the comment about unqualified medical staff in medical records. He claims that Assistant Warden Adduci began to single him out by publicly criticizing him, including publicly criticizing his treatment of inmates Johnson and Rice. The Plaintiff stated under oath that the "only thing that brought up [the lost pharmacy keys] was because I spoke my mind . . . told the Warden that the [medical records] people weren't qualified." The Plaintiff claims that he reported his allegations to the Defendant's Office of Internal Affairs, Office of the General Inspector of Inspector General, and Program Reviewer.

On July 5, 2001, the Plaintiff signed a receipt for an "FS" (fully successful) performance log entry, which indicated, *inter alia*, that the Plaintiff "needs to be more conscientious about his key accountability." On August 30, 2001, the Plaintiff received a disciplinary proposal letter, which recommended that he be suspended for ten days due to the loss of his pharmacy keys. The Plaintiff and his union representative contested this proposal. On October 11, 2001, Warden Gal enforced the proposal but reduced the Plaintiff's period of suspension to five days.

In preparation for FCI-Estill's September 2001 health services department program review, the Plaintiff claims that he and other PAs were asked to back-date glucometer readings and prison transfer forms. The Plaintiff claims that he was retaliated against after he refused to back-date the records. He also claims that about two weeks before the September, 2001 program review, Bush singled him out by using some of his medical charts to illustrate examples of common charting mistakes. Bush stated that she identified

4

errors by three staff members: four by the Plaintiff, two by Dr. Vendale, and 2 by Dr. Parina. The Plaintiff admits that Bush also showed other staff members' erroneous medical chart entries.

Next, the Plaintiff claims that Acting Health Services Administrator Regina Bradley unreasonably delayed his request for bereavement leave, but Bradley and Assistant Warden Adduci did grant the Plaintiff's request for leave. In December 2001, Bradley mistakenly scheduled the Plaintiff for a two-week on-call PA rotation, instead of the customary one-week rotation. Bradley corrected the mistake when it was brought to her attention.

The Plaintiff states that he contacted an EEO counselor on October 18, 2001, immediately prior to taking his bereavement leave. The Plaintiff filed a formal EEO complaint on January 18, 2002. In this complaint, the Plaintiff raised the following five issues: (1) his five-day suspension in October of 2001 for losing the pharmacy keys; (2) the alleged disparate treatment of the Plaintiff by the Assistant Warden verbally admonishing him and singling him out; (3) an "exceeds" performance appraisal, which the Plaintiff claims should have been "outstanding"; (4) his being told to back-date and falsify medical documents for FCI-Estill to pass review; and (5) his not being selected for the supervisory Physician's Assistant position at Estill or for another unspecified position at a regional office.[2] The matters presented in the Plaintiff's EEO complaint are the matters currently before the Court.

_____

[2] It appears from the record that the Plaintiff did not intend to claim that he applied for another unspecified position at a regional office. In fact, there is no evidence of what this unspecified position was or that the Plaintiff actually applied for it. The evidence of record concerns only the Supervisory PA position at Estill.

## STANDARD OF REVIEW

**I.    Legal Standard For Summary Judgment**

To grant the Defendant's motion for summary judgment, the Court must find that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof." Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut" but an important mechanism for weeding out "claims and defenses [that] have no factual bases." Celotex, 477 U.S. at 327.

**II.    Magistrate Judge's R&R**

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility for making a final

determination remains with the Court. Mathews v. Weber, 423 U.S. 261, 269 (1976). The Court reviews *de novo* those portions of the R&R to which a specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1)(C).

## DISCUSSION

As previously set forth, the Plaintiff's complaint sets forth various allegations of employment discrimination based on his race (black) and national origin (Nigerian), as well as allegations of retaliation against him for filing a complaint alleging discrimination and for whistle blowing, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e17, and the Whistleblower Protection Act, 5 U.S.C. §§ 2302. Both Title VII and the Whistleblower Protection Act require administrative exhaustion of claims prior to seeking relief in federal court.

I.   **The Court lacks jurisdiction over the Plaintiff's unexhausted claims under the Whistleblower Protection Act**.

In his motion for summary judgment, the Defendant first asserts that the Court lacks jurisdiction over the Plaintiff's Whistleblower Protection Act ("WPA") claims because the Plaintiff failed to exhaust his administrative remedies. Pursuant to 5 U.S.C. § 1214(c)(1), "[j]udicial review of any final order or decision of the Board under this section may be obtained by any employee, former employee, or applicant for employment adversely affected by such order or decision." Stated differently, "[j]udicial review of a WPA claim occurs only after the Merit Systems Protection Board ("MSPB") has issued a final decision on the claim." See Harris v. Evans, 66 Fed.Appx. 465, 466-67 (4th Cir. 2003)

(unpublished).

Here, there is no evidence that the Plaintiff filed a complaint with the Office of Special Counsel or an appeal to the Merit Systems Protection Board, as required by 5 U.S.C. § 1214. As such, the Court agrees with both the Defendant and the Magistrate Judge that the Court lacks jurisdiction over these claims. Therefore, the Court dismisses the Plaintiff's WPA claims, including his claim related to his allegedly being told to back-date and falsify medical documents for FCI-Estill to pass review. See id. (stating that the district court lacks jurisdiction to hear unexhausted whistleblower claims).[3]

**II.    The doctrine of res judicata bars the Plaintiff's claims related to the calculation of back pay and the payment of attorney's fees because a final judgment was reached in Eneje II.**

Next, in its motion for summary judgment, the Defendant asserts that the Plaintiff's claims related to the calculation of back pay and the payment of attorney's fees are barred by res judicata in light of the final decision in Eneje II. See Eneje v. Ashcroft, 67 Fed.Appx. 901 (6th Cir. 2003), aff'g, 183 F. Supp. 2d 931 (E.D. Ky. 2001), aff'g, EEOC Appeal No. 01973692, 1998 WL 556932 (August 19, 1998). Although the Magistrate Judge does not address this argument in the R&R, the Plaintiff seems to object to it in one sentence of his written objections. (Obj. at 9.) However, the Court finds the Plaintiff's objection wholly without merit; the Plaintiff's claims related to the calculation of back pay and the payment of attorney's fees are barred by res judicata because a final decision was reached in Eneje II. See, e.g., Wearing v. Bovis Land Lease, Inc., 2004 WL 5042295, *2 (E.D.N.C. March 20, 2004), aff'd Wearing v. Howard, 108 Fed.Appx. 806 (4th Cir. 2004) (finding the

---

[3]  The Court notes that the Plaintiff does not seem to object to the Magistrate Judge's recommendation that the Court dismiss his unexhausted whistleblower claims.

Plaintiff's discrimination claims barred by res judicata because a final judgment was issued on the merits in an earlier suit between the parties based on the same facts and an identical cause of action).

## III.    The Plaintiff did not timely initiate certain of his claims alleging discrete acts of discrimination.

In his motion for summary judgment, the Defendant next addresses the issue of whether any of the Plaintiff's alleged discrete acts of discrimination were presented to the EEO counselor in a timely fashion. See 29 C.F.R. § 1614.105(a)(1) ("An aggrieved person *must* initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . .") (emphasis added).

As the Defendant acknowledges, an issue of fact exists as to when the Plaintiff first contacted an EEO counselor. The Plaintiff claims that he initiated EEO Counselor contact on October 18, 2001, but the EEO Counselor documented the date of first contact as November 27, 2001. Regardless, even applying the earlier date – October 18, 2001 – it is clear that the Plaintiff did not contact a Counselor within the 45-day period required by 29 C.F.R. § 1614.105(a)(1), with respect to the following claims: (1) his non-selection for Supervisory PA in June 2000, September 2000, and June 2001; (2) his allegedly "biased" April 2001 performance appraisal; and (3) and performance log entries dated before September 3, 2001. As such, the Defendant urges the Court to dismiss these claims as being unexhausted. See, e.g., Lorenzo v. Rumsfeld, 456 F. Supp. 2d 731, 734 (E.D. Va. 2006) (citing Zografov v. Veterans Admin. Med. Ctr., 779 F.2d 967, 970 (4th Cir. 1985)) ("In general, the failure to consult with an EEO counselor within the required time frame is grounds for dismissing an employee's Title VII claim.").

9

In the R&R, the Magistrate Judge concluded that these claims were not timely initiated and, as a result, not actionable in this suit.

### A.    The defenses of waiver, estoppel, and equitable tolling apply to the 45-day period required by 29 C.F.R. § 1614.105(a)(1).

The Plaintiff strongly objects to the Magistrate Judge's conclusion that these four claims are untimely and not actionable. In so objecting, the Plaintiff does not assert that he did contact an EEO counselor within the 45-day period, as required by 29 C.F.R. § 1614.105(a)(1); rather, he asserts that the Defendant waived the timeliness defense by deciding the merits of his complaint during the administrative process without addressing the timeliness issue.

As previously set forth, Title VII requires a federal employee to exhaust his or her administrative remedies before bringing suit in federal court. 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407. In so exhausting, the employee first must contact an EEO Counselor within 45 days of the alleged discriminatory event. 29 C.F.R. §§ 1614.105(a)(1). This requirement is not a jurisdictional prerequisite to suit, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Irwin v. Veterans Administration, 498 U.S. 89, 95-96 (1990). However, "[f]ederal courts have typically extended equitable relief only sparingly." Irwin, 498 U.S. at 96. The federal courts have allowed equitable tolling "in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Id.

Likewise, the Fourth Circuit Court of Appeals has held that this time limit is not

10

jurisdictional and may be subject to estoppel in certain circumstances. See Zografov, 779 F.2d at 968-69. In Zografov, the Fourth Circuit found that the government should not be estopped from asserting the thirty-day time limit as a defense because the Plaintiff made no showing of affirmative misconduct on the part of the government, "which is the least the court would require." Id. at 969-70; see also Lorenzo, 456 F. Supp. 2d at 734-35 ("But the failure to comply with timely exhaustion may be excused where, as did not happen here, a plaintiff provides 'evidence that he was unaware of the time limits for seeking EEO counseling, or that the government engaged in affirmative misconduct in connection with the failure to seek timely counseling.' ") (quoting Sloane v. Shalala, 166 F.3d 334, 1998 WL 801499, *3 (4th Cir. 1998) (table) (unpublished)).

### B.    The Plaintiff has not shown that he is entitled to equitable tolling.

Here, the Plaintiff has made no showing that he was unaware of the time limits for seeking EEO counseling. Nor could he as he previously has filed at least two other EEO matters and was, therefore, familiar with the filing process. See Webster v. Johnson, 126 Fed. Appx. 583, 587 (4th Cir. Feb. 18, 2005) (unpublished) (finding equitable tolling of the 45-day rule unavailable where the plaintiff previously had filed an EEO complaint because he could not claim that he did not understand how to pursue his rights). In fact, during the Plaintiff's previous litigation, the Sixth Circuit Court of Appeals pointed out that noncompliance with the notice requirement constituted failure to exhaust administrative remedies and affirmed the district court's dismissal of the unexhausted claim. 67 Fed. Appx. 901, 905 (6th Cir. 2003) (unpublished) ("Defendant did not waive any timeliness arguments when it investigated Plaintiff's complaint and, eventually, dismissed it on exhaustion grounds.") Thus, the Plaintiff simply cannot maintain that he was unaware of

11

the time limits or the consequences of failing to meet them.

Additionally, the Plaintiff has not suggested that any extraordinary circumstances prevented him from complying with the 45-day time limit. The Plaintiff simply has made no showing that the government engaged in affirmative misconduct, thereby preventing him from complying with the 45-day time limit. See id. ("Rules for bringing claims are specific for good reason – most importantly to bring prompt resolution to both parties to a claim. We are not authorized to suspend those rules absent efforts by the adverse party to undermine them.") (citation omitted); see also Saltz v. Lehman, 672 F.2d 207, 209 (D.C. Cir. 1982) (stating that the plaintiff has the burden of pleading and proving equitable reasons for his failure to meet the time requirement and denying equitable tolling because the plaintiff did not satisfy this burden).

### C.    The Plaintiff asserts that the Defendant waived the timeliness defense.

Even though the Court finds that the Plaintiff cannot provide evidence that he was unaware of the time limits for seeking EEO counseling, or that the government engaged in affirmative misconduct in connection with the failure to seek timely counseling, so as to support a finding that he is entitled to equitable tolling under the principles set forth above, the Court still must address the Plaintiff's assertion that the Defendant waived the timeliness defense by addressing the merits of his complaint without raising the timeliness defense during the administrative process. It appears that the Fourth Circuit has not ruled on this issue and that other circuits' decisions lack uniformity.

For instance, in Rowe v. Sullivan, the Fifth Circuit Court of Appeals rejected a plaintiff's argument that the EEOC waived a timeliness objection by docketing and acting on his request for reconsideration. 967 F.2d 186, 191 (5th Cir. 1992). The Court stated:

12

. . . such agency action does not, in and of itself, constitute a waiver. *In order to waive a timeliness objection, the agency must make a specific finding that the claimant's submission was timely.* A mere statement that a request for reconsideration is timely does not suffice "because agencies may inadvertently overlook timeliness problems and should not thereafter be bound." As the EEOC made no such finding in this case, there was no agency waiver of the timeliness argument.

Id. (internal citations omitted) (emphasis added). In Boyd v. United States Postal Service, the Ninth Circuit Court of Appeals determined that an agency waives a timeliness defense when it makes a finding of discrimination. 752 F.2d 410, 414 (9th Cir. 1985).

However, in Ester v. Principi, the Seventh Circuit Court of Appeals declined to follow either the Fifth Circuit or the Ninth Circuit and instead concluded that "when an agency decides the merits of a complaint, without addressing the question of timeliness, it has waived a timeliness defense in a subsequent lawsuit." 250 F.3d 1068, 1071-72 (7th Cir. 2001); cf. Bruce v. U.S. Dept. of Justice, 314 F.3d 71, 74 (2d Cir. 2002) (approving Ester but distinguishing it by pointing out that Ester does not address the situation where a governmental agency makes a specific finding of timeliness and communicates it to a complainant without deciding the merits of the case, as happened in Bruce); and Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 45 (1 st Cir. 2005) (finding no waiver where the defendant failed to raise the timeliness issue before the EEOC when the EEOC did not reach a decision on the merits).

In Bowden v. United States, the District of Columbia Circuit Court of Appeals stated that "[a]lthough agencies do not waive a defense of timely exhaustion merely by accepting and investigating a discrimination complaint, we have suggested that if they not only accept and investigate a complaint, but also decide it on the merits - all without mentioning timeliness - their failure to raise the issue in the administrative process may lead to waiver

13

of the defense when the complainant files suit." 106 F.3d 433, 438 (D.C. Cir. 1997). In

Bowden, the Court held that the Immigration and Naturalization Service had waived its

timeliness defense because it responded to the merits of the plaintiff's complaint without

ever questioning its timeliness. Id.; see also Johnson v. Billington, 404 F. Supp. 2d 157,

162 (D.D.C. 2005) (citing Bowden, 106 F.3d at 438-39) ("[W]hen a complainant has

proceeded through administrative channels prior to arriving at the federal courthouse, and

the agency has accepted, investigated and decided that complaint on its merits without

raising the exhaustion issue, the exhaustion defense may be found to have been waived.");

see also Hampton v. Caldera, 58 Fed.Appx. 158, 161 (6th Cir. 2003) (unpublished) (relying

on Bowden in concluding that "absent a determination on the merits, the employer has not

waived the untimeliness defense").

In light of the inconsistent results reached by other circuits, the Court is uncertain

what the Fourth Circuit may one day decide on this issue; however, a review of the case

law leaves the Court with the impression that the Defendant may have waived the defense

of timeliness by deciding the merits of the Plaintiff's complaint without addressing the issue

of timeliness. Thus, without specifically adopting any circuit's approach, the Court, in an

abundance of caution, finds that because the facts of this case may support the Plaintiff's

objection that the Defendant waived the timeliness defense, it is appropriate for the Court

to proceed to consider the merits of the Plaintiff's claims.

**IV.    The Plaintiff's claims fail under the McDonnell-Douglas burden-shifting framework.**

This case does not involve direct evidence of discrimination. Accordingly, the Court

analyzes Plaintiff's claims under the now-familiar McDonnell Douglas burden-shifting

14

scheme. See McDonnell Douglas v. Green, 411 U.S. 792 (1972). Under the McDonnell Douglas burden-shifting scheme, the plaintiff first must establish a prima facie case of discrimination. 411 U.S. 792, 802 (1973); see also Hux v. City of Newport News, 451 F.3d 311, 314-15 (4th Cir. 2006). To do so, the Plaintiff must demonstrate that (1) he is a member of a protected group; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) he was treated differently than similarly situated employees outside the protected class. If the Plaintiff succeeds in establishing a prima facie case, then the burden shifts to the Defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If the Defendant does so, the ultimate burden falls on the Plaintiff to establish "that the legitimate reasons offered by the defendant were not its reasons, but were a pretext for discrimination." Id. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Id. (quoting Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).

A.    **Two of the Plaintiff's claims fail for lack of an adverse employment action.**

Here, the Plaintiff has demonstrated that he is a member of a protected group based on his race (black) and national origin (Nigerian). However, even assuming that the Plaintiff performed his job satisfactorily, he still cannot establish that he suffered an adverse employment action with respect to two of his claims. See Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001) (quoting Munday v. Waste Mgmt. of N. Am.,

15

Inc., 126 F.3d 239, 242 (4th Cir. 1997) (internal quotations omitted)) (stating that an adverse employment action is a discriminatory act that "adversely affect[s]" the "terms, conditions, or benefits" of employment); see also Brockman v. Snow, 2007 WL 493926, *2 (4th Cir. Feb. 13, 2007) (unpublished) ("The standard for an adverse employment action in a disparate treatment case is different than in a retaliation case: in a discrimination case, our precedent mandates that the plaintiff has the higher burden of showing an 'ultimate employment' action that affects 'hiring, granting leave, discharging, promoting, and compensating.'").[4]

First, the Plaintiff's claim of disparate treatment due to Associate Warden verbally admonishing him and singling him out does not amount to an adverse employment action. Likewise, the Plaintiff's claim of disparate treatment in relation to his "exceeds" performance evaluation, which he asserts should have been "outstanding," does not amount to an adverse employment action. Stated simply, these allegations do not amount to adverse employment actions, as the Plaintiff has not established his burden of showing that they are "ultimate employment" actions that affect hiring, granting leave, discharging, promoting, and compensating. As such, the Court finds that the Defendant is entitled to summary judgment on these claims.

The Court next considers the Plaintiff's two claims that potentially do amount to an adverse employment action: (1) his not being selected for the supervisory Physician's

---

[4] The Supreme Court has recently clarified that a different – and less strenuous – standard is used to define adverse employment actions in the retaliation context. See Burlington N. & Santa Fe Rwy. v. White, 126 S.Ct. 2405 (2006) (explaining that the retaliation provision was intended to protect employees from a broader array of employer actions than the substantive discrimination provisions).

16

Assistant position; and (2) his five-day suspension for losing the pharmacy keys.

**B.      The Plaintiff fails to state a discrimination claim with regard to his non-selection for Supervisory PA.**

First, in the context of a failure-to-promote claim, the Plaintiff must show: (1) that he is a member of a protected class; (2) that he applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. See McDonnell Douglas, 411 U.S. at 802.

Here, the Plaintiff is a member of a protected class.  However, with respect to his complaint that he was not selected for the Supervisory PA position in June of 2000, it appears from the record that the Plaintiff did not timely apply for the position, and he was notified that his application was not considered because it was received after the closing date of the application period.  However, even assuming that he did timely apply for the position, it seems that the Plaintiff still cannot establish the fourth prong of the test, namely, that the position remained open after he was rejected and that the employer continued to seek applicants from persons of complainant's qualifications, as the Plaintiff received notification on June 6, 2000, that the supervisory position was closed without selection. See McDonnell-Douglas, 411 U.S. at 802; Felix v. Boeing Co., 229 F.3d 1157 (9th Cir. 2000) (noting that under McDonnell Douglas it is of no consequence whether the employer ultimately filled the position for which the complainant applied; however, the plaintiff needs to demonstrate that she was qualified for at least one of the positions and that after her application was rejected, defendants continued to interview candidates with similar

qualifications).  Because the position was closed without selection, it appears that the Plaintiff fails to establish a prima facie claim with respect to his non-selection in June of 2000. However, even if the Plaintiff could establish a prima facie claim, so as to shift the burden to the Defendant, the Court believes that the Defendant's stated reason for closing the position in June without selecting a candidate – namely, that it was due to budgetary and staffing conditions – constitutes a legitimate, nondiscriminatory reason for the action, and the Plaintiff has not established that it was a pretext for discrimination.

The Plaintiff next asserts, however, that on September 28, 2000, without announcing the position, PA Luis Calvo was appointed as Supervisory PA, and then in June 2001, Raymond Decker was appointed as Supervisory PA. The Plaintiff asserts that he was more qualified than both of these individuals and that neither of them applied for the position.

Interestingly, a review of the record indicates that, technically, the position of Supervisory PA never was filled, and the position remained closed; rather, Calvo and Decker were appointed to the position of *Acting* Supervisory PA by Roy Michael Lathrop, the Acting Health Services Administrator. According to the affidavit of Michael Lathrop, the position of Supervisory PA was left vacant for salary savings, and he instead appointed Calvo and Decker to "act collaterally in that position" based on their experience in that they were the most senior PAs in the department.  The acting position did not result in a promotion, pay increase, or any increased benefits.

Even giving the Plaintiff the benefit of every doubt and considering the appointment of Calvo in September of 2000 and Decker in June of 2001 to Acting Supervisory PA to be the same as if the Defendant actually promoted them to Supervisory PA, thus filling the

18

position, the Court finds that the Plaintiff's claim still fails because the Plaintiff is unable to show that he was not promoted *because of* his race or national origin. See <u>Autry v. North Carolina Dept. of Human Resources</u>, 820 F.2d 1384, 1386 (4th Cir. 1987) ("In order to establish a case of race discrimination, however, Plaintiff would have to be able to show a connection between her race and her failure to be promoted. In other words, she would have to show that she was not promoted *because* of her race, not that she was a member of the black race and was not promoted.") (emphasis in original).

Here, the fact remains that the Defendant notified the Plaintiff that his application was not being considered because it was not received before the application period closed. Moreover, when the Plaintiff initially applied, the Defendant closed the position without selection due to budgetary and staffing concerns, a legitimate, non-discriminatory reason. Several months later, the Defendant appointed an individual of Hispanic descent, Calvo, to serve as Acting Supervisory PA, and then the Defendant appointed Decker, a white individual, to Acting Supervisory PA, based on their seniority and experience. The Defendant technically did not fill the Supervisory PA position; however, even considering the appointment of these two individuals to Acting Supervisory PA to be the same as hiring them as Supervisory PA, thus filling the Supervisory PA position, the Plaintiff still cannot show that he was not appointed based on his race and national origin; rather, the record reflects that Calvo and Decker were appointed based on their seniority and experience, as they were the two most senior PAs. Thus, the Defendant can provide a legitimate, non-discriminatory reason for appointing these two individuals rather than the Plaintiff, and the Plaintiff's conclusory and unsupported allegation that the actions taken by the Defendant were taken in an effort to intentionally discriminate against him based on his race and

national origin fail to rebut the Defendant's legitimate, non-discriminatory reason; therefore, the Court grants the Defendant summary judgment on this claim.

### C.    The Plaintiff fails to state a prima facie claim of disparate treatment with regard to his five-day suspension for losing the pharmacy keys.

To state a prima facie case of discrimination in the context of disciplinary action, the Plaintiff must demonstrate (1) that he engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against him were more severe than those enforced against the other person. See Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985).

Here, the Plaintiff complains that he was subjected to disparate discipline based on his five-day suspension for losing the pharmacy keys. As previously mentioned, the Plaintiff lost his set of keys to a cabinet in the prison pharmacy, which is located inside the prison walls of FCI-Estill. An inmate discovered the keys and gave them to Bush, the Medical Records Supervisor. Bush stated that when she approached the Plaintiff about the keys, she noticed that he was not wearing his security belt key chain, and when she asked him why he was not wearing the security belt key chain, the Plaintiff stated, "I ain't worrying about that . . . [don't] worry about it." According to Bush, the Plaintiff then checked his pockets and realized that he did not have the pharmacy keys. Bush handed the keys to the Plaintiff, who repeatedly thanked Bush. Subsequently, the locks were changed on the affected pharmacy cabinet, which contained hypodermic needles, at a cost of approximately fifteen dollars.

The other incident involving keys, on which the Plaintiff relies to support his claim of disparate discipline, involved Lieutenant Nix and Officer Schmidt, two white males.

20

According to Nix's affidavit, when he was taking some equipment out of the armory, Schmidt, the locksmith, gave him a key ring to the firing range, which is located outside the prison walls. He claims that upon returning the equipment, he turned the key ring into the Control Center because no one from the lock shop was there. He admits that he should not have returned the key ring to the Control Center because it belonged in the lock shop with Schmidt. In any event, a few weeks later, he overheard two individuals stating that they could not find the key to the firing range. Nix stated that the problem was his fault for not receiving a chit and Schmidt's fault for not giving him a chit. The Warden gave Nix and Schmidt verbal reprimands and admonished them for using improper key procedures.

According to Schmidt's affidavit, Nix reported the missing key ring to him and asked him not to report it because he thought he could find it. Over a month later, he reported the missing key ring, and he replaced the locks and created a new key ring at a cost of less than a hundred dollars. According to Schmidt, inmates never had access to the areas controlled by that key ring unless they were supervised. In his affidavit, Schmidt states that he feels like the Plaintiff was discriminated against because he and Nix, being white, were not disciplined for something that was more severe because it cost more to fix the problem.

According to the affidavit of Warden Gal, Nix checked out the key from Schmidt in the lock shop, and he should have taken the key back to the lock shop, but when Nix was finished, Schmidt had gone for the day so he returned it to the Control Center, where it was misplaced and never found. The Warden states that he gave Nix and Schmidt a verbal reprimand in this case as opposed to a suspension because the key ring lost by Nix was not a security key, it was not lost inside the institution, and it accessed an area containing only targets, no firearms. Comparing it to the Plaintiff's situation, Gal stated: "He lost the

21

keys inside the hospital. It was on a secure ring for Medical Services. The key was found

by an inmate where the key was given to another staff member. I think the situations are

entirely different, and that's why I went with a five-day suspension." (Aff. of Gal at 6-7.)

Moreover, when asked whether the key lost by the Plaintiff controlled an area that was

more critical than the area controlled by the key lost by Nix, Gal responded, "Most definitely

because it was in the hospital where records and medications can be found versus an area

that contained only targets." (Id.)

In the R&R, the Magistrate Judge concluded that the Plaintiff has not presented a

claim of disparate discipline because he can point to no other employee who committed

an equally severe infraction and received a lesser punishment. In so concluding, the

Magistrate Judge relied on the fact that the pharmacy is located inside the prison walls and

contains drugs, which could be dangerous if misused, whereas the range house is located

outside the prison walls and contains only targets.

The Plaintiff objects to the Magistrate Judge's finding that the key incident involving

Nix and Schmidt was less severe than his losing the pharmacy keys. In so objecting, the

Plaintiff relies heavily on Schmidt's affidavit wherein Schmidt states that the loss of the

range keys was more severe than the loss of the pharmacy keys.[5] The Plaintiff points out

that Nix used improper key procedure when he received the keys from Schmidt without a

---

[5] The Court finds several portions of Schmidt's testimony misleading at best. For
instance, at one point he states, "The [Plaintiff's] keys were never lost. He just didn't
realize they were out of his possession." The investigator then asked him, "How does that
happen if you know." Schmidt answered by explaining that the clip on the Plaintiff's key
chain had malfunctioned, but nevertheless, Schmidt's statement that the Plaintiff's keys
were never lost is at best misleading considering that an inmate actually found them and
turned them into another staff member.

chit. He then points out that the keys were not recovered and it cost more to replace the range keys than to change the locks in the pharmacy. Finally, the Plaintiff argues that Nix lied about returning the keys to the Control Center.

Even considering these arguments, however, it is clear that the Plaintiff overlooks several crucial points in his assessment of the key incident involving Nix and Schmidt. For example, as the Magistrate Judge pointed out in the R&R, the pharmacy is located inside the prison walls, whereas the range is located outside the prison walls. Also, the key ring lost by Nix was not a security key ring, whereas the pharmacy key was. Stated differently, the Plaintiff lost keys to a cabinet in the pharmacy containing dangerous items; the pharmacy is located inside the prison walls, and the Plaintiff actually lost the keys inside the institution. In contrast, Nix lost keys to a building located outside the prison walls, a building which contains only targets and other innocuous items, and not ammunition or weapons, as the Plaintiff seems to argue. Moreover, Nix lost the keys outside the institution when he turned them into the Control Center, where they allegedly were misplaced. Lastly, one point the Court finds very important in this analysis is the fact that *an inmate actually found the Plaintiff's lost keys* and turned them into another employee. This alone, in the Court's opinion, would support a finding that the two key incidents are not equally severe so as to state a prima facie claim of disparate discipline. As such, the Court overrules the Plaintiff's objections and affirms the Magistrate Judge's conclusion that the Plaintiff fails to state a prima facie case of disparate discipline because he can point to no other employee who committed an equally severe infraction and received a lesser

23

punishment.[6]

Additionally, to the extent the Plaintiff wishes to assert a claim of reprisal in connection to protected activity, namely, his EEO cases from FCI-Ashland, the Court agrees with the Magistrate Judge that the Plaintiff has failed to do so. First, there is no evidence that FCI-Estill management even knew of his previous complaints. Although the Plaintiff asserts that he told unidentified individuals about it and that his record contained the information, he admits that he has no evidence to prove such knowledge. More importantly, even assuming that FCI-Estill management did know about his prior complaints in 1992 and 1996, the passage of time between these prior incidents and the present incident in 2001 does not provide sufficient evidence of causality. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"). As such, the Court agrees with the Magistrate Judge that the Plaintiff has failed to state a reprisal claim in connection with the five-day suspension.



---

[6] Additionally, the Court notes that the Plaintiff's statement that the "only thing that brought up [the lost pharmacy keys] was because I spoke my mind [and] . . . told the Warden that the [medical records] people weren't qualified" belies his assertion that he was disparately disciplined on the basis of his race or national origin.

24

## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED** that the Magistrate Judge's R&R is adopted to the extent it is consistent with this Order; the Plaintiff's objections are sustained in part[7] and overruled in part, the Defendant's motion for summary judgment is granted, and any pending motions are denied as moot.

**IT IS SO ORDERED.**

The Honorable Sol Blatt, Jr.
Senior United States District Judge

March **30**, 2007
Charleston, South Carolina



---

[7] The Court sustains the Plaintiff's objections in part because the Court believes that the Plaintiff may be correct that the Defendant waived the timeliness defense by addressing the merits of his claims during the administrative process without raising the issue of timeliness, and thus, the Court has addressed the merits of the Plaintiff's claims.